IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| SANDRA L. DEMORUELLE,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIAM KUCHARSKI, et al.<br><br>Defendants. | CIVIL NO. 19-00269 JAO-RT<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Sandra L. Demoruelle ("Plaintiff") contends that the construction

and operation of the Ocean View Transfer Station and Recycling Center

("Recycling Center") in Kaʻū, Hawaiʻi injures two endangered or threatened

species—the Hawaiian hawk ("hawk") and the Hawaiian hoary bat ("bat")—in

violation of the Endangered Species Act ("ESA"). Plaintiff brings suit against

three officials connected to this county project: William Kucharski, the Director of

the County of Hawaiʻi Department of Environmental Management ("DEM");

Gregory Goodale, Division Chief of DEM Solid Waste Division; and Allan

Simeon, the Deputy Director of the County of Hawaiʻi Department of Public

Works ("DPW") (collectively, "Defendants"). Presently before the Court are the

parties' cross-motions for summary judgment.  For the following reasons, the

Court DENIES Plaintiff's Motion for Summary Judgment and GRANTS IN PART

and DENIES IN PART Defendants' Motion for Summary Judgment.

## I.    BACKGROUND

### A.    Facts[1]

Plaintiff resides in Ka'ū, approximately 10 miles from the Recycling Center

and 11 miles from Manukā State Wayside Park and Arboretum, and Manukā

Natural Area Reserve (collectively, "Manukā"), with Manukā located less than a

mile from the Recycling Center.  *See* ECF No. 70-3 ("Third Demoruelle Decl.") ¶

8; ECF No. 70-7 ("Pl. CSF") ¶¶ 1–2.  Plaintiff has used Manukā for religious and

recreational activities since 1983, and plans to continue these activities in the

future.  *See* Pl. CSF ¶ 1.  She chooses to engage in these activities at Manukā

because it is the well-known habitat of Hawaiian hoary bats and she enjoys seeing

bats and hawks incidental to her religious, recreational, and social activities in this

area.  *See, e.g.*, Third Demoruelle Decl. ¶¶ 17, 19.  The impetus for this suit arose

when, in April 2019, Plaintiff noticed ongoing construction at the Recycling Center

site.  *See, e.g.*, ECF No. 70-9 at 6.  But the origins of the Recycling Center

project—now more than a decade old—are central to this dispute.

---

[1]  Unless otherwise indicated, the following facts are undisputed.

Sometime before October 2007, DEM created a Draft Environmental Impact

Statement for Ocean View Recycling Point and Convenience Center, Kaʻū District,

Hawaiʻi County ("DEIS").  *See* ECF No. 70-11 at 1.  In November 2007, the

United States Fish and Wildlife Service ("FWS") provided comments on the DEIS

in accordance with various federal environmental protection laws, including the

ESA.  *See id.*  FWS's comments noted that, based on information in the DEIS and

in FWS's files, including the Hawaii Biodiversity and Mapping Program and the

Hawaii GAP Program, "[t]he federally endangered Hawaiian hawk . . . and

Hawaiian hoary bat . . . have been observed in the project vicinity," but the DEIS

"does not adequately address the effects" of the project on those two protected

species.  *See id.* at 1–2.  FWS therefore recommended as follows:

> Construction timing was not defined in the DEIS. Construction timing should avoid disturbance to possible nesting Hawaiian hawk (March–August) and breeding and pupping for the Hawaiian hoary bats (April–August).
>
> Lack of information on Hawaiian hoary bats does not equate to no impacts.  Without understanding bat utilization of the resources at the proposed project, affects [sic] can not be determined.  We recommend that surveys be conducted by a knowledgeable biologist to determine status of the bat within and adjacent to the proposed project footprint.

*See id.* at 2.  In April 2008, DEM responded to FWS by letter.  *See id.* at 3–4.  The

DEM letter claimed that hawks did not nest in trees on the project site, but "[i]n

order to demonstrate this" committed to conducting a pre-construction nest search

by a qualified ornithologist if project construction took place between March and August.  *See id.* at 3.  With regard to bats, the DEM letter acknowledged they "already know that bats are present in the general area" and so claimed a bat survey would be of no use, but did commit to restrict initial land clearing to periods outside the April to August bat pupping period.  *See id.* at 3–4.  The DEM represented that these mitigation efforts were reflected in the Recycling Center's Final Environmental Impact Statement ("FEIS").  *See id.*

Relevant here, the FEIS, published in *The Environmental Notice* on April 23, 2008, provides:

> [T]he following mitigation measures will be implemented:
>
> In order to prevent impacts to Hawaiian hoary bats and Hawaiian Hawks, DEM will restrict initial land clearing to periods outside the April to August pupping period for Hawaiian hoary bats.  Additionally, DEM will arrange a pre-construction nest search by a qualified ornithologist using standard methods if the land clearing occurs within the month of March, the earliest month in the March to August nesting period for Hawaiian Hawks.  If Hawaiian Hawks are present, no land clearing will be allowed until at least September.

ECF No. 70-17 at 1; *see also* Pl. CSF ¶ 17.[2]  The FEIS acknowledges these

---

[2]  With this fact—as with most of Plaintiff's other facts in her concise statement—Defendants object that an "allegation is outside the scope / focus required by LR 56.1(c)."  *See* ECF No. 97-1 (raising the objection for 21 out of Plaintiff's 30 facts).  The local rule that Defendants cite addresses the page limit for a concise statement, and Plaintiff's filing complies with that page limit.  To the extent

(continued . . .)

mitigation efforts were in response to concerns FWS expressed.[3]  *See* ECF No. 70-17 at 2.  The FEIS explicitly recognizes that "[a] small amount of habitat for native birds and a bat will be removed as part of the project."  *Id.*  The FEIS also acknowledges that fire hazard is a secondary biological impact that could reduce the quality of the habitat in the area, but that DEM would mitigate those impacts by constructing a fire break around the facility and providing fire-fighting equipment, including a water tank and fire extinguishers.  *See id.*; *see also* ECF No. 70-31 at 3–6.

Over ten years after the FEIS was published, in August 2018, DPW signed the Notice to Bidders for the Recycling Center project and then, in March 2019, a private construction company began work on the project pursuant to a contract with DEM.  *See* Pl. CSF ¶ 18.  By March 28, 2019, 24.02% of the work on the project had been completed.  *See id.*  At some time—it is unclear from the record when—the contract between DEM and the private construction company was

---

(. . . continued)
Defendants meant to cite Local Rule 56.1(b), and object that certain facts are not "necessary for the court to determine the issues presented in the motion," the objections appear to be entirely without merit—claiming, for example, that a fact related to Plaintiff witnessing land clearing in April is irrelevant.  *See, e.g.*, Defs. CSF ¶ 22.  The Court therefore disregards these ambiguous objections.

[3]  A notice announcing the status of the FEIS in *The Environmental Notice*, published by the Office of Environmental Quality Control, similarly states: "Impacts to wide-ranging endangered species will be avoided by scheduling construction at appropriate times."  ECF No. 70-31 at 9.

amended to incorporate some of the mitigation measures set forth in the FEIS.  *See* ECF No. 70-20.  Specifically, the contract was amended to provide the following limitation on construction:  "In order to prevent impacts to Hawaiian hoary bats and Hawaiian Hawks, initial clearing and grubbing activities are restricted to outside the April to August pupping period for Hawaiian hoary bats[.]"  *Id*.  The amendments in the record do not mention the need to engage in a hawk nest search before undertaking work in March.  *See id.*  Plaintiff requested records that DEM conducted a pre-construction nest search by a qualified ornithologist, as promised in the FEIS, before undertaking land clearing in March.  *See* Pl. CSF ¶ 20.  No records were provided, nor have Defendants submitted evidence that any pre-March construction nest search was undertaken.  *See id.*  Instead, after Plaintiff filed this suit, Defendants hired someone to conduct a search of the site for bats and hawks.  *See id.* ¶ 25.

On April 19, 2019 Plaintiff observed construction activities, which she contends were violations of the FEIS mitigation measures.  *See id.* ¶ 21; ECF No. 70-9 at 2.  And on April 27, 2019, she observed large trees piled at various locations around the project construction site, still with fresh green leaves.  *See* Pl. CSF ¶ 22.  Two days later, on April 29, 2019, FWS provided supplemental comments to DEM—noting that FWS was proactively communicating with DEM again because it had recently received correspondence from members of the public

6

about FWS's prior recommendations for the Recycling Project.  *See* ECF No. 99-2 at 73.  With regard to bats, FWS observed that they roost in exotic and native woody vegetation across all islands and leave young unattended in trees and shrubs when they forage.  *See id.* at 74.  FWS advised that if trees or shrubs 15 feet or taller are cleared during the pupping season, there is a risk that young bats could be harmed or killed because they are too young to fly or may not move away.  *See id.* To minimize impacts to this endangered species, FWS therefore advised:  "Do not disturb, remove, or trim woody plants greater than 15 feet tall during the bat birthing and pup rearing season (June 1 through September 15)."[4]  *Id.*  With regard to hawks, the FWS noted that "[l]oud, irregular and unpredictable activities, such as using heavy equipment or building a structure" near nests could cause nest failure.  *Id.*  FWS also noted that "[h]arassment of Hawaiian hawk nesting sites can alter feeding and breeding patterns or result in nest or chick abandonment" and that nest disturbance can also increase exposure of chicks and juveniles to inclement

---

[4]  FWS's initial comments listed bat breeding and pupping season as April to August.  *See* ECF No. 70-11 at 2.  Evidence in the record from FWS's Recovery Plan for the Hawaiian Hoary Bat provides additional insight about the parameters of bat breeding and pupping season.  *See* ECF No. 70-19 at 1 (noting pregnant female observed in April, large fetuses found in females in May and June, and lactating females found between late June and early August).  And DER repeatedly identified April as the start of bat pupping season, including in the FEIS.  *See* ECF No. 70-11 at 4; ECF No. 70-17 at 1–2.  Neither side raises this issue, which is better left to the factfinder in any event.

weather or predators.  *Id.* at 74–75.  To avoid and minimize impacts to hawks, FWS recommended:  a biologist familiar with the species conduct a nest search of the project footprint and surrounding areas before completing any work between March 1 and September 30 (with surveys valid only for 14 days); that no clearing or construction occur within 1,600 feet of any active nest during breeding season; and that no trimming or cutting of trees with nests be done at any time.  *See id.* at 75.

The Recycling Center opened on August 17, 2019.  *See* Pl. CSF ¶ 29; ECF No. 70-31 at 2.  An investigation conducted on September 6, 2019 by a Fire Inspector with the Fire Prevention Bureau in the Hawaii Fire Department found no fire extinguishers on scene and no water tank installed, contrary to the stated mitigation measures set forth in the FEIS.  *See* ECF No. 70-31 at 10.  There is no evidence that FWS or the State of Hawaiʻi Department of Land and Natural Resources Division of Forestry and Wildlife has brought any enforcement actions[5] against the project alleging (a) a taking of a bat or hawk occurred, (b) any violation of the ESA occurred, or (c) that Defendants failed to comply with the FEIS.  *See* ECF No. 97-1 ("Defs. CSF") ¶¶ 37–42.

---

[5]  To dispute this, Plaintiff cites the letter FWS sent DEM in April 2019 with supplemental comments, *see* ECF No. 99-1 ("Pl. Resp. Defs. CSF") ¶¶ 38–39, but this does not dispute that FWS has not initiated a *formal enforcement action* as Defendants contend.

Since 1980, Plaintiff has visited Manukā "[m]aybe every other month," although her visits can be more on an "ad hoc" basis.  ECF No. 97-3 at 7; Pl. Resp. Defs. CSF ¶ 31.  In general, Plaintiff estimates she sees bats once every 100 times she visits Manukā and hawks about once every five or six times.  *See* Defs. CSF ¶¶ 32–33.  Since Defendants began work on the Recycling Center project, Plaintiff has visited Manukā six to eight times.  *See id.* ¶ 34.  Even after Defendants began work on the project, the frequency and number of hawks she has seen at Manukā has remained the same.  *See id.* ¶ 36.  Since Defendants began work on the project, she has seen three bats—although she claims she saw these ten miles away from the Recycling Center.  Pl. Resp. Defs. CSF ¶ 35 (citing Third Demoruelle Decl. ¶ 6).[6]

## B.   Procedural History

In April 2019, after Plaintiff observed construction at the Recycling Center, she notified DEM it was in violation of the FEIS and requested that construction cease; she received no response.  *See* Pl. CSF ¶ 21; ECF Nos. 70-9, 70-10. Plaintiff filed this action on May 29, 2019 under the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A), seeking an injunction to stop construction

---

[6]  Defendants contend Plaintiff testified she saw these bats in Manukā, but viewed in Plaintiff's favor, the testimony they point to is unclear—and they have not asked the Court to disregard as a sham Plaintiff's declaration providing further explanation.  *See* Defs. CSF ¶ 35; ECF No. 97-3 at 11–12.

activities.[7]  *See* ECF No. 1 ("Complaint").  Defendants moved to dismiss the Complaint, arguing that Plaintiff had not alleged Article III standing and failed to state a claim under the ESA.  *See* ECF No. 43.  The Court granted the motion, concluding Plaintiff had not pled sufficient facts to demonstrate injury in fact.  *See* ECF No. 63.  Plaintiff filed an Amended Complaint that again alleged Defendants were violating the ESA, along with the Administrative Procedure Act ("APA") and sought injunctive and declaratory relief.  *See* ECF No. 67.  Defendants filed an Answer.  *See* ECF No. 68.  The parties then filed cross-motions for summary judgment.  *See* ECF Nos. 70, 97.

## II.   LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "This burden is not a light one."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  When the moving party bears the burden of proof at trial, she must come forward with evidence that would entitle her to a directed verdict if the evidence went uncontroverted at trial,

---

[7]  The initial Complaint named David Bernhardt, Secretary of the Department of the Interior; however, Plaintiff dismissed him from this action on June 13, 2019. *See* ECF No. 21.

and must establish the absence of a genuine issue of fact on each issue material to her case.  *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  In contrast, when the non-moving party bears the burden of proof, the moving party can meet its burden by pointing out the absence of evidence from the non-moving party.  *See id.*  But the moving party need not disprove the opposing party's case.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Rather, if the moving party satisfies this burden, the party opposing the motion must set forth specific facts, through affidavits or admissible discovery materials, showing that there exists a genuine issue for trial.  *See id.* at 323–24; Fed. R. Civ. P. 56(c)(1).

"[A] district court is not entitled to weigh the evidence and resolve disputed underlying factual issues."  *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992) (citation omitted).  Rather, "the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (citation and ellipsis omitted).

## III.   DISCUSSION

## A.   Hawaiian Hawk

"Congress enacted the Endangered Species Act in 1973 in response to growing public concern about extinctions of various species of fish, wildlife, and plants caused by economic growth and development untempered by adequate

concern and conservation." *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 783 (9th Cir. 1995).  Section 9 of the ESA prohibits the "take" of an animal that is listed as an endangered or threatened species.  *See* 16 U.S.C. §§ 1538(a)(1)(B), 1533(d).  A species is endangered or threatened and protected by the ESA if it is listed by the Secretary of FWS pursuant to 16 U.S.C. § 1533.  Although the Hawaiian hawk,[8] was listed on the Federal List of Endangered and Threatened Wildlife when Plaintiff commenced this suit, FWS issued a Final Rule in January 2020 removing the hawk from that list effective February 3, 2020.  *See* Endangered and Threatened Wildlife and Plants; Removing the Hawaiian Hawk From the Federal List of Endangered and Threatened Wildlife, 85 Fed. Reg. 164–89 (Jan. 2, 2020).  Because neither party addressed this development, the Court requested supplemental briefing on how this delisting impacted Plaintiff's claims.  *See* ECF No. 104.

The Court concludes that, "[b]ecause the [Hawaiian hawk] has been delisted, no present controversy can remain" with regard to Plaintiff's claims based on this species.  *Ctr. for Biological Diversity v. Marina Point Dev. Co.*, 566 F.3d 794, 804–05 (9th Cir. 2009).  In *Marine Point*, the Ninth Circuit observed that "[t]he ESA allows a citizen suit for the purpose of obtaining injunctive relief only."  *Id.* at

---

[8]  The parties do not refer to the hawk by its Hawaiian name, 'io, *see* ECF No. 70-26; for clarity, the Court adopts the name used by the parties.

804 (citing 16 U.S.C. § 1540(g)(1)(A)).  There, the district court entered judgment in favor of the plaintiff after concluding defendant's activities and planned project would harass bald eagles.  *See id.*  While the appeal was pending, FWS delisted bald eagles.  *See id.*  The Ninth Circuit therefore concluded the appeal was moot: "Now that the bald eagle has been delisted, nothing we decide can properly give the [plaintiff] the relief it sought" and "whatever might have been the case previously, [defendant] cannot violate the ESA regarding the bald eagle, regardless of any decision we render here."  *Id.*; *see also Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994) (noting that to obtain an injunction under the ESA, "[t]he plaintiff must make a showing that a violation of the ESA is at least likely in the future" (citation and footnote omitted)).  The same reasoning applies here with regard to Plaintiff's ESA claims regarding the Hawaiian hawk, rendering her request for injunctive relief moot.

Plaintiff also requests a declaration that Defendants violated the ESA, but has not argued this distinguishes her case from *Marina Point*.  *See* ECF No. 107 at 1–2.[9]  Even if a request for an injunction is moot, an action can avoid mootness if a declaratory judgment could still provide effective relief.  *See Forest Guardians v. Johanns*, 450 F.3d 455, 462–63 (9th Cir. 2006) (holding that, although the agency

---

[9]  Plaintiff instead notes the hawk is still listed as an endangered species under Hawai'i law; however, her suit seeks redress for violations of the ESA—not any corresponding state law.  *See, e.g.*, ECF No. 67 ¶¶ 40, 101, 103.

defendant undertook the only action plaintiffs sought, a declaration that the agency violated the ESA could provide effective relief by governing the agency's actions going forward and prohibit it from continuing to violate the law). Still, because hawks have been delisted, Plaintiff has not shown how declaratory relief here would resolve a dispute with present and future consequences. *See id.* Thus, even assuming Plaintiff may seek declaratory relief in this action, *but see Marina Point*, 566 F.3d at 804 (noting ESA citizens suits are *only* for the purpose of injunctive relief), any such relief would also be moot. *See Ctr. for Envtl. Sci., Accuracy & Reliability v. Cowin*, No. 1:15-CV-01852-LJO-BAM, 2016 WL 3196774, at *3 (E.D. Cal. June 8, 2016) (recognizing an ESA plaintiff could seek relief under the Declaratory Judgment Act, but holding that form of relief was also moot after defendant ceased complained-of conduct). The Court also lacks the power to award declaratory relief because Plaintiff no longer has the requisite personal interest. *See Bain v. Cal. Teachers Ass'n*, 891 F.3d 1206, 1211 (9th Cir. 2018) (noting plaintiff must satisfy elements of standing at each stage of the litigation); *see also Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003) ("Mootness can be characterized as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (citation omitted)). A declaration that Defendants violated the ESA would not redress her alleged injury

14

of diminished opportunity to see hawks at Manukā. *See Mayfield v. United States*, 599 F.3d 964, 972 (9th Cir. 2010) ("[Defendants] will not be required to act in any way that will redress [Plaintiff's] past injuries or prevent likely future injuries.").[10]

The Court therefore GRANTS summary judgment in favor of Defendants as to Plaintiff's claims based on the Hawaiian hawk.[11]

## B.    Hawaiian Hoary Bat

### 1.    Standing

Defendants seek summary judgment in their favor because Plaintiff has not been injured. *See* ECF No. 97 at 6–8.  Although at the hearing defense counsel claimed this was not a challenge to Plaintiff's standing, the Court has an independent obligation to assess standing where, as here, a defendant contends a plaintiff has not in fact been injured.[12]  The Court will therefore assess Plaintiff's

---

[10]  Nor has Plaintiff argued that any of the "justiciability-saving exception[s]" apply here, which could render a case *not* moot even if the plaintiff would not have standing to bring it today.  *See Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1109 (9th Cir. 2020).

[11]  This includes any claim under the APA based on the hawk, which is also not viable on the merits for the reasons discussed below in Section III.B.2.a.

[12]  Defendants' briefs argued Plaintiff could not show "injury," but never argued that this meant she lacked standing.  *See, e.g.*, ECF No. 102 at 4 (arguing Plaintiff failed to show injury, which is an "essential element" of her ESA claim and that Plaintiff's response that she has standing is "tangential[]" and "does **not**, in any way, discharge Plaintiff's burden to show that she can prove the essential element

(continued . . .)

15

Article III standing, i.e., whether she has demonstrated an injury in fact that is concrete and particularized, as well as actual or imminent, as opposed to conjectural or hypothetical. *See Laidlaw*, 528 U.S. at 180–81.

The Court previously dismissed Plaintiff's Complaint because she failed to plead an injury in fact. *See* ECF No. 63. In her initial Complaint, Plaintiff alleged only that she lives in Kaʻū, the district where the Recycling Center was being built; has a strong interest in bats and hawks; and has observed the animals within the district. *See id.* at 9–10. That was insufficient to establish that Plaintiff has "a connection to the area of concern sufficient to make credible the contention that [her] future life will be less enjoyable—that . . . she really has or will suffer in . . . her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded." *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000).

---

(. . . continued)

at issue here"). Injury to a plaintiff is not an element of a claim brought under the citizen complaint provision of the ESA. *See* 16 U.S.C. §§ 1540(g), 1538(a)(1)(B). Nor does the "zone-of-interests test . . . apply to [a] claim under the ESA's citizen suit provision." *Friends of the Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 920 n.11 (9th Cir. 2018) (citing *Bennett v. Spear*, 520 U.S. 154, 164 (1997); 16 U.S.C. § 1540(g)). Injury to a plaintiff is, however, relevant to the standing analysis in environmental suits. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000).

In her Amended Complaint,[13] and in the evidence submitted in support of her motion for summary judgment, Plaintiff explains that she lives about 10 miles from the Recycling Center and about 11 miles from Manukā, a breeding and foraging habitat for bats.  *See* Third Demoruelle Decl. ¶ 8; Pl. CSF ¶ 1.  Manukā is less than a mile from the Recycling Center.  *See* Pl. CSF ¶ 2.  Plaintiff has used Manukā for religious and recreational activities since 1983, and plans to continue these activities in the future.  *See id.* ¶ 1.  For example, she and her husband use the walking trail, host picnics and parties, and at least three times per year participate in Baha'i religious activities there.  *See* Third Demoruelle Decl. ¶¶ 12, 13, 16, 29. She chooses to engage in these activities at Manukā because it is the well-known habitat of Hawaiian hoary bats—and has even planned "bat watching" parties there.  *See id.* ¶ 17.  Still, because bats are less predictable than animals like whales or butterflies, Plaintiff does not usually go to Manukā intending to see them, but instead, feels lucky and joyful in observing this species incidental to her religious, recreational, or social activities and treasures these sightings.  *See id.* ¶¶ 3, 19–20. She intends to continue these activities of observing bats and enjoying the presence of these species in their native habitat, and also sharing these experiences with friends and family to promote awareness and encourage them to take action to protect this species.  *See id.* ¶¶ 9, 30.  Plaintiff's averments that she visited the

---

[13] Defendants did not move to dismiss Plaintiff's Amended Complaint.

affected area in the past and that the alleged illegal taking of bats at the Recycling Center would impede her ability to see bats while engaging in future activities in the adjacent Manukā area, lessening the aesthetic and recreational value of that area, are sufficient to raise a triable issue that she has suffered an injury to a concrete and particularized interest. *See Cantrell v. City of Long Beach*, 241 F.3d 674, 680 (9th Cir. 2001); *Pac. Lumber*, 230 F.3d at 1150–51.

Defendants nonetheless argue Plaintiff cannot demonstrate injury because her testimony shows that the frequency of her bat sightings has not decreased since Defendants began work on the Recycling Center, meaning there has been no lessening of her ability to see these species nor evidence that her future enjoyment from sightings of these animals will or has been negatively affected.  Defendants cite no authority to support their theory that a plaintiff in an environmental suit cannot show injury as a matter of law when she continues to utilize the area at issue and observe the species she alleges has been harmed by a defendant's violation of environmental protection laws.[14]  Instead, in these suits in particular, "an increased risk of harm can itself be injury in fact sufficient for standing."  *Pac.*

---

[14]  Moreover, Plaintiff only conceded the rate of her *hawk* sightings has remained consistent, and disputes seeing any bats in the Manukā area since construction of the Recycling Center.  *See* Pl. Resp. Defs. CSF ¶¶ 35–36; *see also* Third Demoruelle Decl. ¶ 6.  Because Defendants do not object to Plaintiff's declaration supplementing her deposition testimony, there is at least a factual dispute over the premise of Defendants' argument that Plaintiff has not been injured.

*Lumber*, 230 F.3d at 1151.  A plaintiff need not demonstrate that she has already suffered injury; instead, she can obtain standing based on an injury that is "imminent, not conjectural or hypothetical."  *Id.* (citation omitted); *see also Harris v. Bd. of Supervisors*, 366 F.3d 754, 761–62 (9th Cir. 2004) ("The Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III standing requirements.  And this circuit recently confirmed that a concrete *risk* of harm to the plaintiffs is sufficient for injury in fact." (alterations, citations, and internal quotation marks omitted)).  As the Ninth Circuit explained in holding that a credible threat of harm is sufficient to constitute an actual injury for purposes of standing:

> The ability to challenge actions creating threatened environmental harms is particularly important because in contrast to many other types of harms, monetary compensation may well not adequately return plaintiffs to their original position.  The extinction of a species, the destruction of a wilderness habitat, or the fouling of air and water are harms that are frequently difficult or impossible to remedy.

*Cent. Delta Water Agency v. United States*, 306 F.3d 938, 950 (9th Cir. 2002).

Plaintiff has, at the least, raised a material question of fact with respect to whether there is a substantial risk of harm based on a lessening of her aesthetic or recreational interest in Manukā as a result of Defendants' actions.  She bases her showing of threatened harm on evidence that construction during certain time periods should be avoided so as not to disturb the bat breeding and pupping season;

19

that Defendants agreed to mitigate the risk of such interference to prevent any impact to these species; and that Defendants did not fulfill these stated mitigation measures.  *See, e.g.*, Pl. CSF ¶¶ 3–4.

That Plaintiff has raised a material dispute sufficient to survive summary judgment is particularly so here, where her allegations and evidence pertain to Defendants' interference with bat breeding and pupping—which suggests, as a matter of logic, that any diminishment in her ability to enjoy these species would be more noticeable as time progresses as opposed to being immediately apparent. *See, e.g.*, ECF No. 97-3 at 3 (testifying she saw bat habitat trees on the ground during pupping season).  Requiring Plaintiff to prove that the population of bats has actually been diminished confuses the jurisdictional standing inquiry with the merits questions in this case.  *See Cantrell*, 241 F.3d at 682; *Pac. Lumber*, 230 F.3d at 1152.

In addition, Plaintiff contends Defendants began operating the Recycling Center without implementing *other* safety measures laid out in the FEIS, including those that would mitigate fire hazards given that fires indisputably occur at these facilities.  *See* Pl. CSF ¶¶ 4, 28.[15]  This includes opening the Recycling Center

---

[15]  Defendants contend this is disputed; however, they cite only Plaintiff's deposition testimony—none of which actually disputes this fact.  *See* Defs. CSF ¶ 4.

without firebreaks in place and without firefighting equipment. *See id.* ¶ 27;[16]

*compare* ECF No. 70-31 at 3–7 (FEIS noting that fires do occur at these facilities

and that biological impact could include fire hazards, which would be mitigated by

the provision of fire-fighting equipment, including fire extinguishers and a water

tank), *with* ECF No. 70-31 at 10 (letter from Fire Inspector reporting that a

September 2019 investigation revealed no fire extinguishers or water tank on site

despite FEIS providing that both shall be on site).  Plaintiff attests that Defendants'

lack of mitigation efforts to address a known fire hazard at the Recycling Center

threatens to lessen the aesthetic and recreational value of the Manukā area she

visits in close proximity to the Recycling Center.  *See* Third Demoruelle Decl. ¶¶

11, 15, 28.  Plaintiff has raised a triable issue with regard to this risk and, with

regard to *this* risk, Plaintiff's continued sighting of bats in no way detracts from the

actual injury of a credible threat of that harm.  *See Cent. Delta Water Agency*, 306

F.3d at 949–50 (agreeing with other circuits that have recognized that action

creating a risk of environmental harm can be challenged before the potential harm

occurs and citing favorably *Mountain States Legal Foundation v. Glickman*, 92

---

[16]  Defendants contend this fact is outside the scope of the Amended Complaint; however, Plaintiff alleged as much in that pleading.  *See* ECF No. 67 ¶¶ 17, 42, 62. And, again, to dispute this fact they cite only:  (a) Plaintiff's testimony, none of which addresses fire preparedness, and (b) that federal and state agencies have not alleged violations of the ESA or failure to comply with the FEIS, which *at most* would raise a triable issue regarding whether they were actually in compliance with fire mitigation measures set forth in the FEIS.  *See* Defs. CSF ¶ 27.

F.3d 1228, 1234–35 (D.C. Cir. 1996), which held that an increased risk of wildfire from certain logging practices constitutes injury in fact); *cf. Rosboro Lumber*, 50 F.3d at 786 ("Nowhere does Congress indicate that a plaintiff's standing to enjoin such grave threats [under the ESA] is contingent upon a showing of past injury [to the protected species]." (footnote omitted)); *Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1064 (9th Cir. 1996), *as amended* (June 26, 1996) ("In this circuit, we have repeatedly held that an imminent threat of future harm [to the protected species] is sufficient for the issuance of an injunction under the ESA." (citations omitted)).

The Court therefore concludes Plaintiff has come forward with sufficient evidence to survive summary judgment on the issue of standing.

### 2.      Merits

Plaintiff primarily asks the Court to conclude that Defendants have violated Section 9 of the ESA, which makes it unlawful to "take any [endangered] species within the United States."  16 U.S.C. § 1538(a)(1)(B).  But Plaintiff also purports to seek other forms of relief, including under the APA and for other violations of the ESA.  The Court will address the merits of these latter claims first, both of which can quickly be dispensed with in Defendants' favor.  The Court will then turn to the primary issue in this case—whether Defendants violated Section 9 of the ESA with regard to Hawaiian hoary bats—which, after careful consideration, the Court concludes cannot be resolved in either parties' favor at this juncture.

22

### a.   Violation of the Administrative Procedure Act

Aside from alleging violations of the ESA, Plaintiffs' Amended Complaint alleges Defendants also violated the APA.  Such claims are not viable for two reasons.[17]  First, Defendants are county officials and none acted in the capacity of a federal agency, rendering the APA inapplicable.  *See* 5 U.S.C. § 701(b)(1) (defining "agency" as "each authority of the Government of the United States"); *see also Gilliam v. Miller*, 973 F.2d 760, 764 (9th Cir. 1992) (holding plaintiffs failed to state claim under APA because defendant took action in his capacity as a state officer, rendering the APA inapplicable).  Second, the APA applies only where there is "no other adequate remedy in a court," 5 U.S.C. § 704, and because the ESA provides a citizen suit remedy for the claims Plaintiff brings here, she cannot bring additional claims under the APA.  *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496–97 (9th Cir. 2011); 16 U.S.C. § 1540(g)(1)(A).  Plaintiff also does not object—and effectively conceded at the hearing that her claims under the APA are without merit.  *See* ECF No. 107 at 2–4 (arguing only that the Court should consider evidence outside the administrative record).  The Court therefore GRANTS summary judgment in Defendants' favor as to any claim under the APA.

---

[17]  Neither party specifically addressed Plaintiff's APA claims, and so the Court also requested supplemental briefing on this topic.  *See* ECF No. 104.

### b.   Failure to Apply for an Incidental Take Permit under Section 10 of the ESA

Plaintiff's second claim for relief alleges Defendant Simeon ("DPW Defendant") violated the ESA by failing to obtain FWS approval on certain permit applications for the Recycling Center project.  To the extent Plaintiff contends DPW Defendant violated the ESA by failing to seek an incidental take permit ("ITP") from FWS and develop a corresponding Habitat Conservation Plan ("HCP") or require DEM to do so,[18] any such claim fails.

If a proposed action constitutes a take under Section 9 of the ESA, a party *may* apply for an ITP under Section 10.  *See* 16 U.S.C. § 1539(a)(1)(B).  If FWS grants the ITP, the party can proceed with the proposed activity despite the taking of an endangered species.  *See id.*  The Ninth Circuit has made clear, though, "that pursuing an ITP is not mandatory and a party can choose whether to proceed with

---

[18]   Neither party offers much explanation or clarity regarding the precise basis for Plaintiff's second claim; however, it appears that Plaintiff is objecting to DPW Defendant's decision not to seek or require an ITP—and so the Court interprets this claim as such.  *See, e.g.*, Pl. CSF ¶ 24; ECF No. 70-28 at 2–3 (noting, as allegedly problematic, that DPW applications for Grading and Grubbing permits on land within the County of Hawaiʻi do not require applicant to obtain Section 10 ITP or State Incidental Take License, nor require compliance with Section 7 of the ESA).  Plaintiff does not explain how Section 7 applies here nor has she submitted any evidence of a federal nexus with the Recycling Center project, e.g., that it required federal approval, permits, or funding.  *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1238 (9th Cir. 2001) ("Section 7 of the Act imposes an affirmative duty to prevent violations of Section 9 upon federal agencies" that "extends to 'any action authorized, funded, or carried out by such agency[.]'" (quoting 16 U.S.C. § 1536(a)(2)).

the permitting process." *Defs. of Wildlife v. Bernal*, 204 F.3d 920, 927 (9th Cir. 2000) (citation omitted).  The risk, of course, is that if a party does not obtain an ITP from FWS and its activity takes an endangered species, it is subject to penalties.  *See* 16 U.S.C. § 1540.  "Thus a party may proceed without a permit, but it risks civil and criminal penalties if a 'take' occurs."  *Bernal*, 204 F.3d at 927 (holding district court did not err in concluding defendant was not required to seek an ITP).  DPW Defendant here was not required to seek an ITP, meaning any failure to do so is not itself a violation of the ESA.  *See id.*  And at the hearing, Plaintiff conceded that DPW Defendant is not required to obtain an ITP.  The Court therefore GRANTS summary judgment in DPW Defendant's favor as to any claim he violated the ESA by failing to apply for and obtain an ITP under Section 10, or require DEM do so.[19]

---

[19]  Notably, at least one district court concluded a project would take a listed species in violation of Section 9 and therefore granted injunctive relief conditioning defendants' ability to resume the project on their application for and obtaining of an ITP.  *See Animal Welfare Inst. v. Beech Ridge Energy LLC*, 675 F. Supp. 2d 540, 580 (D. Md. 2009).  Whether this Court may order similar relief here depends both on the merits of Plaintiff's Section 9 claim and, if necessary, any later assessment of appropriate equitable relief.  In light of Plaintiff's representation at the hearing about a potential "phase 2" of construction at the Recycling Center, such relief may be appropriate.  But because the parties' briefs focus only on whether Plaintiff has shown Defendants violated the ESA rather than Plaintiff's entitlement to an injunction—e.g., Defendants have not argued Plaintiff cannot "make a showing that a violation of the ESA is at least likely in the future"—the Court need not address Plaintiff's entitlement to injunctive relief at

(continued . . .)

### c.     Violation of Section 9 of the ESA

As discussed above, Section 9 of the ESA prohibits the "take" of an animal that is listed as an endangered species.  *See* 16 U.S.C. § 1538(a)(1)(B).  A species is "endangered" and protected by the ESA if it is listed by the Secretary of FWS pursuant to 16 U.S.C. § 1533, and the Hawaiian hoary bat is listed as endangered. *See* 50 C.F.R. § 17.11 (citing 35 Fed. Reg. 16047 (Oct. 13, 1970)).  Under the ESA, to "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  Plaintiff here contends Defendants Kucharski and Goodale ("DEM Defendants") have or will "harass" or "harm" bats.  The implementing regulations, 50 C.F.R. § 17.3, further define these terms:

> Harass . . . means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering[.]
>
> Harm . . . means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by

---

(. . . continued)
this time.  *Burlington N. R.R.*, 23 F.3d at 1511 (citation and footnote omitted); *see also Wishtoyo Found. v. United Water Conservation Dist.*, No. CV 16-3869-DOC (PLAx), 2017 WL 6940510, at *20–21 (C.D. Cal. Dec. 1, 2017) (noting that, although enforcement of ESA is forward-looking, past actions are relevant in determining whether future takings are reasonably likely to occur).

> significantly impairing essential behavioral patterns, including breeding, feeding or sheltering.

"Harm" may be indirect and prospective, e.g., in the form of habitat modification; however, habitat modification alone may not constitute harm unless it actually kills or injures wildlife. *See Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1237–38. Thus, although habitat modification may not itself be a "take" under Section 9, *see id.*, "habitat modification that is reasonably certain to injure an endangered species by impairing their essential behavioral patterns satisfie[s] the actual injury requirement and [is] sufficient to justify a permanent injunction." *Bernal*, 204 F.3d at 925; *see also Rosboro Lumber*, 50 F.3d at 784 ("So long as some injury to wildlife occurs, either in the past, present, or future, the injury requirement of the Secretary's new definition [of harm] would be satisfied.").

## 1.    Harass

Although Plaintiff contends DEM Defendants have harassed the bats, *see, e.g.*, ECF No. 67 ¶ 17; ECF No. 70-1 at 37; Third Demoruelle Decl. ¶ 11, DEM Defendants' briefing does not address this form of take nor move for summary judgment in their favor on this issue.[20]  Summary judgment in DEM Defendants' favor on this issue is thus inappropriate.  But neither is it appropriate in favor of

---

[20]  *See Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (noting that pro se pleadings are construed more liberally than those drafted by attorneys, affording the pro se plaintiff the benefit of the doubt).

Plaintiff.  Although she raises the issue, she offers no argument or analysis.  *See* ECF No. 70-1 at 37.  The Court does not marshal evidence or manufacture arguments for parties, *cf. Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994), and so cannot grant judgment as a matter of law for Plaintiff based only on a bare assertion.

### 2.      Harm

DEM Defendants argue Plaintiff cannot demonstrate harm as a matter of law because:  (1) she admitted she never saw dead bats at the Recycling Center; (2) her rate of sighting bats has remained consistent even after the Recycling Center construction began; and (3) no federal or state agency has brought an enforcement action alleging that DEM Defendants are not complying with the terms of the FEIS or violated the ESA.  The Court concludes that, viewing the evidence in the light most favorable to Plaintiff, summary judgment in DEM Defendants' favor is unwarranted.

Plaintiff has raised a triable issue regarding whether bats use or occupy any portion of the Recycling Center site.  There is evidence that bats have been observed in the project vicinity, and have the potential to be in and fly through the project area.  *See* ECF No. 70-11 at 1–2; ECF No. 99-2 at 73–75.  DEM Defendants also conceded they knew bats were in the general area, *see* ECF No. 70-11 at 3, and Plaintiff submitted evidence demonstrating that historic and current

distribution of the bat includes the Recycling Center site, *see* Pl. CSF ¶ 16.[21]  In

addition, the FEIS recognized that "[a] small amount of habitat for native birds *and

a bat will be removed* as part of the project."  *See* ECF No. 70-17 at 2 (emphasis

added).  And, while habitat impact alone is not actionable under the ESA, the

record here offers evidence that engaging in construction during certain time

periods risked disturbing bat breeding and pupping season (if completed between

April and August).  *See, e.g.*, ECF No. 70-11 at 2; ECF No. 70-17 at 1–2.  In light

of this, the FEIS set forth certain mitigation measures, such as not completing any

land clearing from April through August.  *See* ECF No. 70-17 at 1–2.  The FEIS

thus represented that impacts to this endangered species would be avoided by

conducting construction at appropriate times and after undertaking appropriate

precautionary measures.  *See id.*; *see also* ECF No. 70-31 at 9.  There is additional

evidence that, if trees higher than 15 feet were cleared during pupping season,

young bats could be killed because they would be unable to fly or leave.  *See* ECF

---

[21]  Defendants object to the admissibility of this map, but cite no specific rule of
evidence or legal principle under which the map is inadmissible.  *See* Defs. CSF ¶
16.  The Court therefore will not guess at what specific objection Defendants
attempt to raise.  The Court notes, however, that Plaintiff represents that the map is
from the Recovery Plan for the Hawaiian Hoary Bat published by FWS.  *See* ECF
No. 70-8 at 1; *see also* Fed. R. Evid. 803(8) (public records can be non-hearsay);
Fed. R. Evid. 902(5) (publication purporting to be issued by a public authority is
self-authenticating).  And, significantly, Defendants previously argued in this case
that a different FWS document could be judicially noticed because it was not
subject to reasonable dispute.  *See* ECF No. 43 at 11 n.1.

No. 99-2 at 73–75.  The FEIS, in turn, recognizes the site is "dominated" by 10 to 20 feet ʻōhiʻa trees, with some even larger, *see* ECF No. 70-15, and Plaintiff reports (without objection from DEM Defendants) that trees removed in March and April were over 15 feet, *see* ECF Nos. 70-8, 70-16; *see also* ECF No. 97-3 at 3 ("I saw trees that were bat habitat laying on the ground at the point in time when young pups are nursing on their mothers").

Despite all this, it is undisputed that construction on the site began in March 2019 and concluded sometime before August 2019.  *See* Pl. CSF ¶¶ 4, 20, 29. Evidence shows that 24% of the project was completed by the end of March, with line items indicating 0% of one type of "Clear and Grub," 100% of another type of "Clear and Grub," and 90% of "Grading: Excavation" were completed in March. *See* ECF No. 70-21; Pl. CSF ¶ 18.  That DEM Defendants hired an individual to survey the site months later in May 2019—after Plaintiff notified them of her intention to file a citizen suit under the ESA—is of no moment, particularly when Plaintiff submitted evidence that questions that person's stated credentials and therefore his credibility.  *See* Pl. CSF ¶¶ 25–26.  In addition, it is also undisputed that, despite the FEIS statement that bat pupping and breeding seasoning would not be interfered with, DEM Defendants permitted construction to continue into April, evidenced by Plaintiff's undisputed contention that she observed violations of the FEIS mitigation measures on April 19, 2019 and observed large trees with fresh

30

green leaves piled around the construction site on April 27, 2019 in the precise habitat where bat pups are known to reside.  *See id.* ¶¶ 3–4, 21–22;[22] *see also* ECF No. 97-3 at 3.

As discussed above, it is also undisputed that DEM Defendants have operated the Recycling Center without the stated fire hazard mitigation measures set forth in the FEIS, including by failing to have extinguishers and a water tank on site.  *See* Pl. CSF ¶¶ 3–4, 27.  This despite it being undisputed that fires occur at these facilities.  *See id.* ¶ 28.  Particularly in light of this evidence raising triable issues that the FEIS has, indeed, been violated, DEM Defendants' only evidence cited in dispute—that no agency has enforced a FEIS violation—is insufficient to justify judgment in their favor.[23]

---

[22]   DEM Defendants offer, in response, evidence that no agency brought an enforcement action for failing to comply with the terms of the FEIS.  *See, e.g.*, Defs. CSF ¶¶ 3, 21.  But this does not necessarily dispute evidence tending to show a violation of the FEIS actually occurred.  Elsewhere DEM Defendants do not even dispute Plaintiff's contention that the FEIS mitigation measures were not followed.  *See* Defs. CSF ¶ 4 (responding to Plaintiff's contention that no nest check occurred and that other FEIS mitigation efforts were not undertaken by citing Plaintiff's deposition testimony about how often she has seen hawks and bats since construction began).

[23]   DEM Defendants' reliance on evidence that no agency has brought enforcement actions for ESA violations and their argument that enforcement of the ESA rests *exclusively* with certain federal and state agencies also misses the mark.  *See* ECF No. 97 at 10.  Plainly, Congress also empowered individuals to seek to enforce the

(continued . . .)

DEM Defendants object that Plaintiff has no direct evidence of any dead bats[24] on the site, but cite no authority that direct evidence is necessary to survive summary judgment on a Section 9 claim.   *See Greenpeace Found., Ctr. for Biological Diversity v. Mineta*, 122 F. Supp. 2d 1123, 1134 (D. Haw. 2000) (noting that circumstantial evidence can be the basis for a finding of adverse habitat modification).   In *Mineta*, for example, the court denied summary judgment regarding an alleged take of monk seals related to lobster fishing based on circumstantial evidence that the removal of lobsters would result in an adverse habitat modification.   *See id.* at 1133–35.   There was no conclusive evidence that lobster comprised a significant and essential portion of the monk seal diet; instead, the role of lobster in the monk seal diet was a question of fact that precluded summary judgment in favor of either party on the Section 9 claim.   *See id.*   So, too, here, where material questions of fact exist regarding whether there has been habitat modification reasonably certain to injure bats, including by impairing

_____

(. . . continued)
protections of the ESA by enabling them to bring citizen suits such as this one. Again, while this evidence may ultimately be relevant and reason not to grant Plaintiff's motion, it does not justify granting judgment in DEM Defendants' favor.

[24]  At the hearing, counsel for Defendants claimed that Plaintiff must prove a take has already occurred because threatened harm is insufficient.  Not so.  *See, e.g.*, *All. for the Wild Rockies v. U.S. Dep't of Agric.*, 772 F.3d 592, 605 (9th Cir. 2014) ("A take may involve a past or current injury, or the prospect of an imminent threat of harm to a protected species." (citation omitted)).

32

behaviors like breeding, nesting, and pupping. *See Bernal*, 204 F.3d at 925; *see also Rosboro Lumber*, 50 F.3d at 788 (reversing grant of summary judgment where disputed facts remained as to whether proposed plan to harvest timber was reasonably certain to injure a pair of endangered owls by significantly impairing their essential behavioral patterns, including breeding, feeding, and sheltering). Particularly relevant here, DEM Defendants repeatedly acknowledged based on FWS guidance that certain activity should not occur to avoid impact to these protected species, and then engaged in that activity nonetheless. *Compare All. for the Wild Rockies*, 772 F.3d at 605 (affirming grant of summary judgment in favor of defendant because, although defendant's own reports acknowledged a certain type of helicopter hazing could cause significant disruption to grizzly bear behavioral patterns, there was no evidence showing defendant's conduct constituted that type of hazing). DEM Defendants also acknowledged that, once operational, certain mitigation efforts should be in place to prevent fire hazards that could otherwise reduce the quality of area habitat, but have not undertaken those efforts.[25] Because disputed facts remain as to whether DEM Defendants' construction and operation of the Recycling Center has or is reasonably certain to

---

[25] Because DEM Defendants offered no argument or evidence in response to Plaintiff's argument concerning fire hazards, the Court concludes Plaintiff has at least raised a triable issue regarding whether this amounts to more than a mere potential injury to bats that would not be actionable. *See Rosboro Lumber*, 50 F.3d at 784–85.

injure bats, including by impairing the bat's essential behavioral patterns, summary judgment is not appropriate in favor of either party.  The Court therefore DENIES both parties' motions for summary judgment on this issue.

## IV.    CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's Motion for Summary Judgment.  The Court GRANTS IN PART Defendants' Motion for Summary Judgment with respect to Plaintiff's claims related to Hawaiian Hawks and for violations of the APA and Section 10 of the ESA, and otherwise DENIES Defendants' Motion for Summary Judgment.  Thus, all that remains for trial is Plaintiff's Section 9 claim with regard to the Hawaiian Hoary Bat against DEM Defendants.

IT IS SO ORDERED.

DATED:  Honolulu, Hawai'i, May 29, 2020.



Jill A. Otake
United States District Judge

Civil No. 19-00269 JAO-RT, *Demoruelle v. Kucharski, et al.*, ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEDENDANTS' MOTION FOR SUMMARY JUDGMENT